UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

PETER BLEUS,
     Plaintiff,

v.                         CASE NO:6:23-cv-1763-CEM-UAM

UNITED PARCEL SERVICE, INC.
     Defendant.
_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Peter Bleus. ("Plaintiff or Mr. Bleus"), by and through the undersigned counsel, and hereby files his Response in Opposition to Defendant's United Parcel Service, Inc. ("UPS" or "Defendant") Motion for Summary Judgment [Doc. 73-74] ("Motion"). In support thereof, Plaintiff states as follows:

## I.    INTRODUCTION

Plaintiff worked for UPS from 2001 until his termination in December 2019. During his employment with UPS, Plaintiff was very outspoken concerning the discriminatory treatment he faced at UPS from his Division Manager Julius Gwinn aka Tripp Gwin ("Mr. Gwin"). *See* Exhibit 12, Deposition of Julius Gwin at p.12 line 23 – p. 13 line 11; Exhibit 5. Following a lawsuit that Plaintiff filed in 2012 concerning the racism he experienced from Mr. Gwin, UPS agreed to relocate Mr. Gwin to a different center and leaders at UPS told Plaintiff that he would not have

to worry about Mr. Gwin upon his return. *See* Exhibit 10, Deposition of Peter Bleus at p.130 lines 8-21; see *also* Exhibit 6, 2013 Complaint of Discrimination. Mr. Gwin claimed that he could not recall why he was transferred but his lack of recollection does not negate Plaintiff's testimony concerning what he was told by UPS. *See* Exhibit 12 at p. 19-20. When Mr. Gwin was not his division manager, Plaintiff received little to no discipline in the course of his employment. However, in 2017 when Mr. Gwin was transferred back to the longwood division which included the Colonial Center where plaintiff worked, Plaintiff was subjected to a campaign of discrimination and retaliation, as Mr. Gwin directed the leaders below him to target and over-supervise Plaintiff to find a way to terminate Plaintiff's employment. *See* Exhibit 12 p. 12 line 23 – p. 13 line 11; Exhibit 24, unwarranted discipline.   This campaign of discrimination against Plaintiff was due to his race *See* Exhibit 10; *see also* Exhibit 2. In an effort to terminate Plaintiff UPS also violated its own policies and procedures in regard to the disparate application of its policies against Plaintiff as compared to his white counterparts. *See e.g.* Exhibit 2, showing disciplinary action against white versus black employees.

## II.    STATEMENT OF MATERIAL FACTS IN DISPUTE

### A. Material Facts in Dispute Concerning Plaintiff's performance and the illegitimacy of the Disciplinary Actions Taken Against Plaintiff.

The record clearly shows that Plaintiff performed his work without issue until,

suddenly, upon Mr. Gwin's transfer to the longwood division, Plaintiff was subjected to over-supervision and harassment due to his race, which resulted in a series of unwarranted discipline and his ultimate termination. *See* Exhibit 10 at p. 52 lines 11-25; p. 197 lines -13. Plaintiff was an employee on whom Mr. Guevara, his former supervisor, could rely to routinely deliver results." *See* Exhibit 1 at p. 6 line 25- p. 7 line 6. Customers often called UPS to provide good comments concerning plaintiff's performance. *See* Exhibit 10 p. 45 lines 2-9; Exhibit 15 p. 32 lines 1-10. When Mr. Gwin became the manager of the longwood division, Mr. Gwin targeted Mr. Bleus and his supervisors were "instructed to go out and look for …reasons to discipline and terminate" Mr. Bleus." *See* Exhibit 1, at p.8 line 23 - p. 10 line 1.; p. 11 lines 8-24; *see also* Exhibit 10, at p. 232 line 10 – p. 233 line 1.

UPS policies provide for one yearly safety ride where the supervisor would go through a checklist with the employee to perform said evaluation.  In addition to that yearly ride, Plaintiff was subjected to an excessive amount of random observational rides where he was harassed by his supervisors so they can issue discipline to him. *See* Exhibit 4 Email Correspondence. UPS claims that the reason why Plaintiff was overly supervised was because he was often over-allowed. This is pretextual as other drivers who were over-allowed were not subjected to as many OJS rides. Further, it is undisputed that being over-allowed can be caused by many factors outside of the driver's control including but not limited to mistakes by the

pre-loader[1], a dispatcher, weather, and others and that even a "fantastic employee' can be over-allowed. *See* Exhibit 12 at p. 40 line 22 – p. 41 line 15; *see* Exhibit 1 at p. 51 lines 8-16.  The record shows that Plaintiff would also appear on a lot of reports because he was always willing to take over some work for others, including making deliery of 'next day air" packages that other drivers do not have the time to deliver or returning packages that did not belong in his truck. *See* Exhibit 1 at p. 28 line 15- p. 29 lines 14 ("when we would have route that we would need to cover for a different center, Pete would be one of the drivers to go do it."); *see id* at 33 lines 1-14 (discussing inflation of over-allowed telematics).   The record also contains specific evidence of issues with Plaintiff's loads that were not caused by plaintiff. *See* Exhibit 18 (discussion of pre-loader mistakes that affected Plaintiff).

In addition to issues that were outside of Plaintiff's control, the disciplinary action that was taken against Plaintiff was part of a calculated targeted effort to terminate him because of his race and because he made complaints concerning the discrimination. *See* Exhibit 5, labor log; Exhibit 17, Grievances. For instance, even though the October 30, 2029 ride was supposed to be a yearly safety ride, Mr. Estevez did not go through the checklist with Plaintiff and instead spent his time harassing Plaintiff. *See* exhibit 10 p. 236 line 13- p 237 line 15. This is apparent in

---

[1] The pre-loaders are the employees responsible for scanning the packages prior to placing and organizing them into the truck.

an email correspondence written by Mr. Estevez to Mr. Gwin, admitting that he may have used the wrong "approach" with Plaintiff, Mr. Estevez stated in part: "[t]hankfully, it aggravated him enough that he made plenty of mistakes for me to get him for." *See* Exhibit 4, email Correspondence. During the October 30, 2019 ride with Plaintiff, Mr. Estevez taunted and harassed giving him conflicting directing in order to cause I'm to make mistakes, just so he can discipline him. The mere fact that Mr. Estevez testified that he does not recall doing so is not enough to negate Plaintiff's recollection of the events. *See* Exhibit 4; Exhibit 14 Deposition of Raul Estevez at p. 75 lines 7-19. Even though it was clear that Mr. Estevez has had communications with Mr. Gwin concerning Plaintiff, he adamantly denied discussing Mr. Bleus in any way with Mr. Gwin prior to Mr. Bleu's termination. *See* Exhibit 14, p. 67 lines 4-25. This adds to the credibility determination that the jury must evaluate in considering the testimony of Mr. Estevez.

### B. Material Facts in Dispute Concerning the Disparate Treatment of Plaintiff as compared to his white counterparts

There are material facts in dispute concerning the over-supervision of Plaintiff. While Defendant alleges that Plaintiff was subjected to more supervision than other employees because of his performance, the record shows that plaintiff was targeted by Mr. Gwin and that the OJS rides to which plaintiff was subjected were excessive in light of Defendant's policies and procedures. *See* Exhibit 1 p. 31 lines 7-24; *see also* Exhibit 26, Article 66. Specifically, in describing the directives

to observe Plaintiff, his former supervisor Mr. Guevara stated in part: "it was above and beyond what would be a normal practicum … observing a driver and holding them accountable and that white drivers were ignored for conduct used to target Plaintiff was targeted. *See* Exhibit 1 at p. 48 line 22- p. 49 line 18. A driver can be over-allowed for reasons that are outside of the driver's control, including weather, mistakes made by loaders and the fact that the driver was being observed during that time or assigned work that was not originally assigned to him at the beginning of the day, all of which slows the process. *See id.* at p. 35-36; Exhibit 18.

Even though Mr. Piastuch and Ms. Cristel had a similar performance with Plaintiff and was often over-allowed, Mr. Gwinn never directed Mr. Guevara to target Mr. Piastuch and Ms. Cristel, whereas he often directed the supervisors to target Plaintiff. *See id.* p. 12 lines 12-15. Mr. Guevara was bever instructed to observe Mr. Wayne henry even though Mr. Henry was not meeting the expectations required for his position. *See id.* at p. 11 line 25-p. 12 line 1; p. 15 lines 6-8. Similarly to Mr. Henry, Mr. Guevara was never directed to target Mr. Ormsby and the disciplinary actions taken against him were based on his performance. *Id.* at p. 15 line 20-p. 16 line 3. However, Mr. Gwin directed Mr. Guevara and others to follow Plaintiff to find a reason to discipline him. *See id.* p. 31 lines 7-13 (he expected you to go out and find something to discipline them on.").

The objective facts on the record demonstrate a clear and systemic pattern of

discriminatory enforcement of the progressive discipline against Plaintiff. *See* Exhibit 2, Disciplinary Action Records at the Colonial Center. White employees who commit similar infractions received appropriate processive discipline with multiple opportunities to correct behavior while Plaintiff was subjected to accelerated escalation to Intent to Discharge letters, multiple intent to discharge notices without actual resolution, and discipline frequency more than 6 times higher than comparable white employees. *See id*. It was so well-known that Plaintiff was targeted by Mr. Gwin that drivers who were subjected to discipline would say to management not to treat them like Peter Bleus. *See* Exhibit 10 at p. 225.

UPS did not follow progressive discipline as it related to Plaintiff, as depicted below:

| Date | Discipline Type | Alleged infraction | Evaluation of progressive discipline |
|---|---|---|---|
| 2/20/2018 | LOR | | |
| 6/27/2019 | Warning letter | FTFI | no prior verbal warning or LOR in the prior 9 months |
| 6/27/2019 | Warning letter | FFTI conduct | no prior verbal warning or LOR in the prior 9 months |
| 7/3/2019 | Warning letter | FTFI methods | no prior verbal warning or LOR in the prior 9 months |
| 7/11/2019 | Warning letter | FTFI Pick-up and delivery methods | no prior verbal warning or LOR in the prior 9 months |
| 7/16/2019 | Intent to discharge | FTFI Pick-up and delivery methods | No prior suspension. Additionally, no prior verbal warning or LOR |
| 7/16/2019 | Suspension | FTFI Pick-up and delivery | No prior verbal warning or LOR for prior conduct. |

| | | methods | |
|---|---|---|---|
| 8/13/2019 | Intent to discharge | FTFI Pick up and delivery | No prior suspension. Additionally, no prior verbal warning or LOR |
| 8/13/2019 | Intent to discharge | FTFI safety | No prior discipline whatsoever for safety. meanwhile Daphne Cristel was issued a LOR on the same day and not a warning letter as depicted in the chart. See Exh. 11. |
| 10/24/2019 | Intent to Discharge | FTFI Pick-up and delivery | Compounding effect of lack of progressive discipline |
| 10/24/2019 | Intent to Discharge | FTFI Pick-up and delivery | Compounding effect of lack of progressive discipline |
| 10/24/2019 | Intent to Discharge | FTFI safety | |
| 11/18/2019 | Intent to Discharge | FTFI Pick-up and delivery | Compounding effect of lack of progressive discipline and multiple punishment for the same alleged conduct. punishment given for following orders from supervisor. |
| 11/18/2019 | Intent to Discharge | FTFI Pick-up and delivery | Compounding effect of lack of progressive discipline and multiple punishment for the same alleged conduct. punishment given for following orders from supervisor. |
| 11/18/2019 | Intent to Discharge | FTFI Pick-up and delivery | Compounding effect of lack of progressive discipline and multiple punishment for the same alleged conduct. punishment given for following orders from supervisor. |
| 11/18/2019 | Intent to Discharge | FTFI Pick-up and delivery | Compounding effect of lack of progressive discipline and multiple punishment for the same alleged conduct. punishment given for following orders from supervisor. |

| 11/18/2019 | Intent to Discharge | FTFI Pick-up and delivery | Compounding effect of lack of progressive discipline and multiple punishment for the same alleged conduct. punishment given for following orders from supervisor. |
|---|---|---|---|

*See* Exhibit 2. The above disciplinary actions are a clear indicating that the was targeted, especially since plaintiff was followed "nearly every day, sometimes by two supervisors. *See* Exhibit 10, p. 232 line 10 – p. 233 line 1.

Comparatively, Brian McDonough, a white driver as issued progressive discipline and even reverted to a warning letter following a suspension. *See* Exhibit 2. Similarly, even though Daphne Cristel, a white employee was often over-allowed, she was only issued disciplined twice between in that two-year period. *See id*; *see also* Exhibit 3, over-allowed list showing that Ms. Cristel was often Over-allowed. Further, Plaintiff and Ms. Cristel were issued disproportionate discipline on the same day for the same conduct. *See* id. Specifically, Plaintiff was issued an intent to discharge for FTFI safety even though he had never received prior discipline for safety whereas Ms. Cristel received verbal warning. *See id*, *see also* Exhibit 11, LOR concerning Ms. Cristel.

### C. Material facts in Dispute Concerning the Timeliness of Plaintiff's Grievance Challenging his Termination.

Defendant alleges that Plaintiff did not file a grievance on time which resulted in his ultimate termination. Plaintiff alleges that his grievance was timely. Even

though the decision to terminate plaintiff was upheld during the grievance process, it does not conclusively establish that fact that the timing of the disciplinary letter that Plaintiff received is a material fact in dispute. Further, Defendant claimed that it had a video surveillance that could conclusively corroborate their position concerning the timing of the disciplinary letters. *See* exhibit 27 at 11 (Bleus000686). However, defendant did not and still has not provided such video evidence. Lastly, even though he claims that he does not recall, Mr. Gwin admits to being involved in the termination of Mr. Bleus. *See* Exhibit 12 at p. 111 lines 8-16. His selective memory is suspicious and suggest evasiveness which is an issue for the jury's consideration.

The record is clear that Plaintiff was subjected to excessive supervision in violation of the CBA and in violation off UPS's policies and that the progressive discipline rules were not followed with regard to Plaintiff. *See* Exhibit 22[2]; see also Exhibit 26 ("the employer shall not in any way intimidate, harass, coerce, or overly supervise any employee in the performance of this or her duties). While Mr. Gwin testified that suspension can be skipped, he could not specify which circumstances would leave to the skipping of the suspension step in the progressive discipline of employees. *See* Exhibit 12, p. 60 line 10 – p. 62 line 8. Further, the record also

---

[2] Een though Defendant disputes the legitimacy of this document, several witnesses testified to bring familiar with it and relying upon it in the context of issuing discipline. See e.g. Exhibit 14 p. 26 lines 16-24.

shows that the suspension step was not skipped for white employees. *See* Exhibit 2. Furthermore, Mr. Estevez admits that he did not do the research to determine discipline level prior to issuing discipline to Plaintiff and that he issued separate disciplinary letters for the same action. *See* Exhibit 14, Deposition of Raul Estevez, p. 65 line 21 – p. 66 line 11; p. 20 line 19- p. 21 line 2.  The methods of issuing the discipline to Plaintiff was also different than white employees as plaintiff was given self-contradicting letters even though there were templates that would remove all confusion, while his white counterparts were issued letters that were clear and consistent with the requirements of the CBA. For instance, the November 2019 letters issued to Plaintiff included language for both warning and  intent to discharge letters and were undated and unsigned, given to the union steward while he was still on the road. *See* Exhibit 15 p. 50 lines 17-25. Conversely, Mr. Ormsby received a proper intent to discharge letter that was consistent with the requirements of the CBA. *See* exhibit 13, Intent to Discharge Letter to Aaron Ormsby.

## III.   MEMORANDUM OF LAW

### A. Summary Judgment Standard

Summary judgment is appropriate in only those cases in which there is no genuine dispute as to a material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Of course, a party seeking summary judgment always bears the initial

responsibility of informing the district court of the basis of its motion, and

identifying those portions of the pleadings, depositions, answers to interrogatories,

and admissions of file, together with the affidavits, if any, which it believes

demonstrates the absence of a genuine dispute of material fact. *Id*.

To defeat a motion for summary judgment, a plaintiff need not produce

evidence that would require a verdict in his favor, rather, he need only demonstrate

that there is sufficient evidence "to require a jury or a judge to resolve the parties'

differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248-49 (1986) (quoting *First National Bank of Arizona v. Cities Services, Co.*,

291 U.2. 253, 288-89 (1968)). In contrast, a court's decision to grant a motion for

summary judgment in warranted only "… where it is quite clear what the truth is…"

*Poller v. Columbia Broadcasting System*, 368 U.S. 464, 467 (1962).

In the trial court's consideration of a summary judgment motion, "the

evidence of the non-movant is to be believed, and all justifiable inferences are to be

drawn in his favor." *Anderson*, 477 U.S. 650, 656 (2014) (internal citation omitted).

"Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions. *Reeves v. Sanderson*

*Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000); Fed. R. Civ. P. 56 (where "an

issue as to a material fact cannot be resolved without observation of the demeanor

of witnesses in order to evaluate their credibility, summary judgment is not

appropriate."); *see also Short v. Immokalee Water & Sewer Dist.*, 888 F. Supp. 139, 143 ( M.D. Fla. 1995) ("[[i]t is not the role of this Court  to decide how credible a witness is or to weight he evidence).

In the instant case, Defendant disregarded the legal standard governing a motion for summary judgment by ignoring allegations, or construing facts in a light most favorable to itself. The disputed facts presented regarding the discriminatory actions taken against Plaintiff including the disparate treatment he suffered require credibility determinations and evaluation of witness testimony that are inappropriate for summary judgment. As there are a multitude of material facts in dispute, Defendant's Motion should be denied.

   **B. Defendant is not entitled to summary judgment because there is a dispute of material facts concerning intentional race discrimination.**

Summary judgment must be denied on the discrimination claims as there are material facts in dispute concerning discriminatory acts against Plaintiff and the disparate treatment to which he was subjected in the workplace.  "[B]ecause employers who engage in illicit discrimination rarely leave records of their invidious acts, cases in which discrimination is proved through direct evidence are rare." *Copley v. Bax Global, Inc.*, 807 F. Supp. 2d 1342, 1350 (S.D. Fla. 2000).  Thus, the United States Supreme Court set out a burden shifting framework designed to draw out the necessary evidence in employment discrimination cases in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802, (1973).

Under the McDonnel Douglas framework, the plaintiff must first establish that (1) he belongs to a protected class, (2) he was subjected to an adverse employment action, (3) he was qualified to perform the job in question, and (4) his employer treated 'similarly situated' employees outside his class more favorably. *See id*; *see also Tynes v. Florida Department of Juvenile Justice*, 88 F.4th 939, 944 (11th Cir. 2023). Once a plaintiff has shown the above and has thus established a prima facie case showing he is entitled to a rebuttable presumption of intentional discrimination, the defendant must rebut that presumption only by offering evidence of a valid, non-discriminatory justification for the adverse employment action. *See id*. If the court finds that the defendant has shown a valid, non-discriminatory reason, then the burden shifts back to the plaintiff who must show that the employer's justification was pretextual and that the employment action was discriminatory. *Id.*

The burden-shifting analysis of *McDonnell Douglas* is neither an "independent standard of liability" under Title VII nor is the prima facie case "the sine qua non for a plaintiff to survive a summary judgment motion." *Tynes*, 88 F.4th at 944-45 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). Plaintiff may also prove his case by presenting a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1327-28; *see also* Le*wis v. City of Union*

*City*, 934 F.3d 1169, 1185 (11th Cir. 2019). "[T]he plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith*, 644 F.3d at 1328; *See also Bailey v. Bd. Of Regents of Univ. of Ga.*, 2022 U.S. App. LEXIS 27171 (11th Cir.2022). This is true even if Plaintiff does not provide evidence of a comparator. *See Tynes*, 88 F.4th at 946. Further, even though the strength of the comparator evidence provided by a plaintiff is relevant to the ultimate decision concerning intentional discrimination, "it is a jury's role … to determine how much weight the comparator evidence should be given." *Id*. at 947. Thus, the court focusses on "whether there is sufficient basis for the jury to find that the defendant intentionally discrimination against the plaintiff." *Id*. at 946.

Further, "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive.  In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose … Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000) (internal citations and quotations omitted) (Furthermore, a

plaintiff need not show additional, independent evidence of discrimination to rebut the employer's explanation so long as there are sufficient facts to reject the employer's explanation and permit a finding of liability. *See id.* (internal citation omitted).

The record is replete with evidence of race discrimination against Plaintiff. *See e.g.* Exhibit 2; Exhibit 10; Exhibit 16; Exhibits 19-21; Exhibit 25. Plaintiff has established that he is qualified for his position and that he met the requirements for his position. *See* Exhibit 10 p. 45 lines 2-9. Exhibit 1 p. 7 line 2. Plaintiff also provided evidence that he was punished more severely, harassed for conduct that did not subject his white counterpart to supervision. *See* Exhibit 10, Exhibits 2-3. The fact that Mr. Gwin also targeted white drivers who defended the black employees and white drivers who complained concerning the violation of their employment rights, does not preclude plaintiff's claims for race discrimination. Here, it was clear that Mr. Gwin targeted Mr. Mason because Mr. Mason advocated for the black and Hispanic employees who were subjected to discrimination. *See* Exhibit 15, p. 24 lines 5-16.

Plaintiff has also established Defendant's alleged legitimate reasons were pretextual. Defendant argues that Plaintiff was targeted because of his over-allowed numbers, however, the record is clear that other employees who were over-allowed were not followed or subjected to OJS rides nearly every day like Plaintiff was. *See*

Exhibit 2, Exhibit 3.   Further even when plaintiff did not have any prior discipline
for safety and both Plaintiff and Daphne Cristel were followed by Janyra Arrufat,
Plaintiff received an intent to discharge letter while Daphne Cristel received a verbal
waring. *See* exhibit 11, Exhibit 8. Here, Plaintiff presented evidence of
discriminatory intent for a jury's consideration.

### C. Plaintiff has shown sufficient facts to support punitive damages.

Defendant's Motion for Summary judgment on punitive damages fails
because genuine issues of material fact exist regarding whether UPS acted with
malice or reckless indifference to Plaintiff's federally protected rights. Under Title
VII, a plaintiff may recover punitive damages if the defendant "engaged in a
discriminatory practice… with malice or with reckless indifference to the federally
protected rights of an aggrieved individual. *See EEOC v. Exel, Inc.*, 884 F.3d 1326,
13331 (11th Cir. 2018). "The supreme court has established that his standard
focus[es] on the actor's state of mind" and "does not require a showing of egregious
or outrageous discrimination independent of" that state of mind. *See id*.   Malice
means "an intent to harm" and recklessness means "serious disregard for the
consequences of one's actions." *Merard v. Magic Burgers, LLC*, 2022 U.S. App.
LEXIS 21115 * 5 (11th Cir. Aug. 1, 2022), *United States EEOC v. W&O Inc.*, 213
F.3d 600,611-12 (11th Cir. 2000). Importantly, a jury may still find reckless
indifference where the employer does not admit that it knew its actions were wrong.

See *id*. The standard requires that an employer must have discriminated "in the face of a perceived risk that its actions w[ould] violate federal law." *Merard* at *5. The terms "malice or reckless indifference pertain to an employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. ADA*, 527 U.S. 526 (1999). However, where there is credible evidence that a defendant intentionally discriminated against a plaintiff because of race, coupled with the defendant's knowledge that racial discrimination is illegal, this is sufficient for a reasonable jury to conclude that the standard for punitive damages has been satisfied. *Lambert v. Fulton County*, 253 F.3d 588, 598 (11th Cir. 2001).

Here, the evidence establishes triable issues of fact concerning punitive damages. The record shows that Plaintiff was clearly targeted and substance to constant and excessive supervision in violation of the CBA when white employees are not subjected to the same treatment. Supervisors have told plaintiff that their intention was that he would be terminated before the end of the day. *See* Exhibit 17. They also regularly harassed and insulted Plaintiff. Specifically, Jeremy Myrick told Plaintiff "look in the mirror and see what's effed up about you" and Raul Estevez specifically admitted to aggravating plaintiff enough that it caused Plaintiff to make mistakes that he then used as a basis to discipline him. *See* Exhibit 4; Exhibit 10 at p. 55 line 220- p. 56 line 15; Exhibit 17 (grievance no. 105750) (demonstrating the

type of discriminatory animus that supports punitive damages). This direct evidence of hostile treatment based on race goes beyond mere awareness of discrimination and suggests intentional targeting.

Further, the comparator evidence provided by Plaintiff is particularly significant because many of these employees were under the same center manager, Janyra Arrufat and also were all under the leadership of Julius Gwin who targeted Plaintiff. UPS was also aware of Mr. Gwin's racist treatment of employees as Plaintiff and other had made prior complaints concerning race discrimination against Mr. Gwin and Defendant took no action to discipline Mr. Gwin. Exhibit 10 p. 237 lines 16-22. Rather, UPS continued to cycle Mr. Gwin through all the divisions, instead of terminating him for his discriminatory acts. *See* Exhibit 12 p.12 -16. [3]

Defendant argues that UPS's anti-discrimination policies negate any inference of malice or reckless disregard. However, the mere existence of policies is insufficient to defeat punitive damages claim where there is evidence that management acted contrary to those policies with knowledge of their discriminatory conduct. *See Miller v. Kenworth of Dothan Inc.*, 277 F.3d 1269, 1280 (11th Cir. 2002); *see also Merard v. Magic Burgers, LLC*, 2022 U.S. App. LEXIS 21115 at *5.

---

[3] Further, UPS's failure to provide complaints of discrimination filed against Mr. Gwin that has now been provided by Mr. Coffy even though its policies provide for the retrieval of those items within the past 7 years, and the recording of Ms. Cristel's lor as a warning further evidences its malicious intent. *See* Exhibits 23-25; Exhibit 2.

The evidence shows that Plaintiff received five Intent to Discharge letters dated November 18, 2019, all arising from a single incident on October 30, 2019. *See* Exhibit 8. Plaintiff testified that the dates of discipline were so close together that UPS did not even allow him an opportunity to address the alleged problem with his performance. *See* Exhibit 10 lines 17-23. This rapid escalation of discipline, particularly when viewed alongside the comparator evidence and contradictory instructions during his October 30, 2019 ride with Mr. Estevez, supports an inference that management was deliberately building a case for termination based on discriminatory animus and not issuing discipline because they wanted Plaintiff to correct a perceived behavior.

The combination of direct evidence of discriminatory statements, disparate treatment compared to white employees, contradictory instructions designed to create grounds for discipline, and management's knowledge of discrimination complaints establishes a triable issue sufficient to survive summary judgment on punitive damages. Accordingly, Defendant's motion for summary judgment on punitive damages should be denied.

## IV.    CONCLUSION

The record contains disputed material facts regarding Plaintiff's discrimination claims. These disputes preclude summary judgment and require resolution by a jury after full consideration of the evidence and witness credibility.

**WHEREFORE**, for the foregoing reasons and other reasons this Honorable Court may find, Plaintiff Peter Bleus respectfully requests that this Honorable Court deny Defendant's Motion for Summary Judgement in its entirety.

Dated:  October 13, 2025                    Respectfully Submitted,

AZOR LAW PLLC

/s/Naphtalie Azor
Naphtalie Azor
Fla. Bar No. 1024060
AZOR LAW, PLLC
200 N Laura St., 9th FL
Jacksonville, FL 32202
(904) 902-3061
nazor@azorlaw.com
info@azorlaw.com
service@azorlaw.com
Counsel for Plaintiff

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 13, 2025, a true and correct copy of foregoing filed using ECF which shall provide a copy to all counsel of record.

/s/ Naphtalie Azor
Naphtalie Azor, Esq.
Attorney for Plaintiff